**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

CREDIT SUISSE AG and LARA
WARNER,

              Petitioners,

-against-

COLLEEN A. GRAHAM,

              Respondent.

Civil Action No.: 1:21-cv-00951


**PETITIONERS' MEMORANDUM OF LAW IN SUPPORT OF**
**<u>PETITION TO ENJOIN ARBITRATION</u>**

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ..................................................................................................1

STATEMENT OF FACTS ........................................................................................................3

      A.      Credit Suisse and Palantir launch Signac, a joint venture technology
             company...........................................................................................................3

      B.      Respondent initiates JAMS I alleging "misappropriation" of Signac's
             technology.......................................................................................................4

      C.      After losing JAMS I, Respondent pursues, and loses, a Sarbanes-Oxley
             whistleblower claim before OSHA arising out of the same chain of events. ..........6

      D.      More than nine months after the JAMS I Award, Respondent files a
             Petition to Vacate in this Court.............................................................................7

      E.      Respondent files JAMS II which involves the same claims, allegations,
             and requests for relief as JAMS I...........................................................................9

ARGUMENT .........................................................................................................................13

CONCLUSION......................................................................................................................18

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*In re Am. Exp. Fin. Advisors Sec. Litig.*,
   672 F.3d 113 (2d Cir. 2011) ................................................................13

*Arrowood Indem. Co. v. Equitas Ins. Ltd.*,
   No. 13CV7680 DLC, 2015 WL 4597543 (S.D.N.Y. July 30, 2015) .............................. *passim*

*Citigroup Glob. Markets Inc. v. VCG Special Opportunities Master Fund Ltd.*,
   No. 08-CV-5520BSJ, 2008 WL 4891229 (S.D.N.Y. Nov. 12, 2008),
   *aff'd*, 598 F.3d 30 (2d Cir. 2010) ...........................................................14

*Corey v. New York Stock Exch.*,
   691 F.2d 1205 (6th Cir. 1982) ...........................................................2, 17

*Decker v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
   205 F.3d 906 (6th Cir. 2000) .........................................................13, 14

*Goldman, Sachs & Co. v. N. Carolina Mun. Power Agency No. One*,
   No. 13 CIV. 1319 PAC, 2013 WL 6409348 (S.D.N.Y. Dec. 9, 2013) ...................................14

*Gulf LNG Energy, LLC v. Eni USA Gas Mktg. LLC*,
   242 A.3d 575 (Del. 2020) .........................................................2, 13, 14

*J.P. Morgan Sec. Inc. v. La. Citizens Prop. Ins. Corp.*,
   712 F. Supp. 2d 70 (S.D.N.Y. 2010) ...................................................1, 13

*Oppenheimer & Co. Inc. v. Pitch*,
   129 A.D.3d 621 (1st Dep't 2015) ...................................................2, 13

*Prudential Sec. Inc. v. Hornsby*,
   865 F. Supp. 447 (N.D. Ill. 1994) .........................................14, 16, 17, 18

*Wall Street Assoc., L.P. v. Becker Paribas Inc.*,
   27 F.3d 845 (2d Cir. 1994) ...................................................................2

## STATUTES

9 U.S.C.
   § 4 ..................................................................................................1, 13
   § 10 ...............................................................................................*passim*

## RULES

N.Y. C.P.L.R.
   § 7511(b)(1)(i) ..................................................................................................................7

## REGULATIONS

22 N.Y.C.R.R. § 1250.10(a) ...........................................................................................9

Petitioners Credit Suisse AG and Lara Warner submit this memorandum of law in support of their petition pursuant to Section 4 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 4, for an order permanently enjoining the arbitration filed by Colleen A. Graham ("Respondent" or "Ms. Graham") before Judicial Arbitration and Mediation Services, Inc. ("JAMS") on December 22, 2020 ("JAMS II").

## PRELIMINARY STATEMENT

In a flagrant attempt to circumvent Section 10 of the FAA, Ms. Graham has now filed JAMS II—an action that asserts the very same claims and seeks to obtain the very same forms of relief that have been denied twice before.  Indeed, after bringing an action before JAMS in October 2017 ("JAMS I") and finding herself unsuccessful on all counts, Ms. Graham filed a Petition to Vacate the award from JAMS I before the Supreme Court of the State of New York ("state court"), claiming fraud and misconduct.  But even after hearing the state court's rejection of her claims, and instead of pursuing a FAA-sanctioned appeal of the state court's decision, Ms. Graham decided to file JAMS II:  an attempt at a complete "do over," with the same tired allegations and claims that were considered and rejected in JAMS I, premised on the same allegations of fraud and misconduct that were considered and rejected by the state court.

Unfortunately for Ms. Graham, while seeking vacatur of an arbitral award is permitted under the FAA, what she attempts to do here is not.  As further explained below, this petition turns on the incontrovertible facts set forth herein and three hornbook principles of law regarding challenges to final arbitration awards.  **First**, pursuant to Section 4 of the FAA, district courts have the power to enjoin arbitration proceedings. *J.P. Morgan Sec. Inc. v. La. Citizens Prop. Ins. Corp.*, 712 F. Supp. 2d 70, 76 n.38 (S.D.N.Y. 2010).  And because this petition is brought to enjoin arbitration on the basis of the collateral attack doctrine, it is properly addressed to a court—not an

1

arbitral tribunal.  *See Gulf LNG Energy, LLC v. Eni USA Gas Mktg. LLC*, 242 A.3d 575, 583–88 (Del. 2020); *see also Oppenheimer & Co. Inc. v. Pitch*, 129 A.D.3d 621, 622 (1st Dep't 2015).

**Second**, Section 10 of the FAA provides the exclusive method for challenging arbitral awards.  *Arrowood Indem. Co. v. Equitas Ins. Ltd*., No. 13CV7680 (DLC), 2015 WL 4597543, at *5 (S.D.N.Y. July 30, 2015); *see also Wall Street Assoc., L.P. v. Becker Paribas Inc.*, 27 F.3d 845, 849 (2d Cir. 1994) ("Under the FAA, the validity of an award is subject to attack only on those grounds listed in § 10, and the policy of the FAA requires that the award be enforced unless one of those grounds is affirmatively shown to exist.").  It states that an arbitral award may only be contested or modified by a petition to vacate under the grounds enumerated in the FAA, and any appeal therefrom, in a court of competent jurisdiction.  It does not allow a losing party in an arbitration, like Ms. Graham, to commence and abandon that process only to file a second arbitration action premised on the same set of events.

**Third**, both this Court and courts across the country have previously held that a party, like Respondent, cannot use a second arbitration, like JAMS II, to "collateral[ly] attack" an award from a previous arbitration, like JAMS I.  *Arrowood Indem.*, 2015 WL 4597543 at *6; *Gulf LNG Energy*, 242 A.3d at 588–92.  Indeed, this Court has considered and rejected the very arguments that Respondent hints at in JAMS II—namely, that a collateral attack on a prior arbitration award is somehow permitted where the claimant in the second arbitration alleges concealment of evidence or targets new parties.  *Arrowood Indem.*, 2015 WL 4597543 at *6; *see also Corey v. N.Y. Stock Exch.*, 691 F.2d 1205, 1213 (6th Cir. 1982).

For these reasons and those stated below, Petitioners respectfully request that this Court grant this petition and enter an order permanently enjoining JAMS II.

## STATEMENT OF FACTS

**A.      Credit Suisse and Palantir launch Signac, a joint venture technology company.**

Signac was formed in February 2016 as a 50/50 joint venture between a Credit Suisse AG affiliate, Credit Suisse First Boston Next Fund, Inc. ("CSFB"), and Palantir Technologies, Inc. ("Palantir").  (Pet. to Enjoin ¶ 13.)  Signac is governed by the Second Amended and Restated Limited Liability Company Agreement, effective as of February 29, 2016 (the "LLC Agreement"). (*Id.*)  Signac's business plan was to develop and market an "Enhanced Trading Oversight" solution ("ETOS")—a technology and services platform that would allow banks to more effectively monitor and combat inappropriate trading.  (*Id.*)

Signac was overseen by a four-member Board of Managers that included:  (i) Ms. Graham, Signac's Chief Supervisory Officer; (ii) Mr. Hunter, Signac's Chief Information Officer; (iii) Matt Long, a representative of Palantir; and (iv) Petitioner Lara Warner, who served as a representative of CSFB.  (*Id.* ¶ 14.)  Ms. Warner and Mr. Long each had two votes, while Ms. Graham and Mr. Hunter each had one vote.  (*Id.*)  Ms. Graham and Mr. Hunter were also the lead executives responsible for operating Signac.  (*Id.* ¶ 15.)  Ms. Graham was paid a substantial salary, and she and Mr. Hunter received identical minority ownership interests in Signac subject to a three-year vesting schedule.  (*Id.*)

The vision for Signac was as follows:  If Signac could be the first to market a true end-to-end and effective ETOS offering to the world's premier financial institutions, Signac might quickly be able to command premium prices from multiple clients across the globe.  (*Id.* ¶ 16.)  Signac's first, and ultimately only, client was Petitioner Credit Suisse AG.  (*Id.*)  Signac and Credit Suisse AG entered into a Master Services Agreement ("MSA"), pursuant to which Signac granted Credit Suisse AG a permanent license to any trader surveillance technology created by Signac.  (*Id.*)

Unfortunately, Signac never ended up developing a true end-to-end ETOS offering that could be marketed to third parties. (*Id.* ¶ 17.) In fact, after more than one year of operations, Signac had not achieved even one of the initial goals set out by the joint venture's partners. (*Id.*) As a result, Credit Suisse AG determined that it could no longer justify paying for Signac's services and, instead, exercised its contractual and unilateral right to terminate the MSA. (*Id.*)

In June 2017, after the loss of Signac's one and only client, Signac's Board of Managers approved the dissolution of Signac by an 83.3% supermajority vote. (*Id.* ¶ 18.) Respondent was the only Manager to object to, or vote against, dissolution. (*Id.*) Notably, despite his status as the Chief Information Officer of Signac, and notwithstanding the fact that he had the exact same economic interest in Signac as Respondent, Mr. Hunter also voted in favor of dissolution. (*Id.*)

## B. Respondent initiates JAMS I alleging "misappropriation" of Signac's technology.

On or about October 25, 2017, Ms. Graham filed JAMS I subject to the parties' agreement to arbitrate. (*Id.* ¶ 19.) Ms. Graham subsequently amended her claim on or about November 20, 2017. (Ex. 2, JAMS I ANOC.) (*Id.*) JAMS I (like JAMS II) is essentially a derivative action brought by Respondent in her capacity as an owner of an unvested 2% interest in Signac. (*Id.* ¶ 20.)

Respondent's core allegation in JAMS I was that CSFB and Palantir improperly dissolved Signac so they could "strip" it of all assets, including the technology that Signac had attempted to develop for its one and only client, Credit Suisse AG. (*Id.* ¶ 21.) Respondent further alleged that CSFB, and its parent, Credit Suisse AG, had ███████████████████████████████████ ████████████████████████████████████████████████ and were continuing to use Signac technology following the dissolution of the company. (*Id.*) This is the very same allegation that underlies JAMS II. (*Id.*)

The parties jointly selected Michael D. Young ("Arbitrator Young") to preside over JAMS I. (*Id.* ¶ 22.)  Arbitrator Young has "conducted over 1,850 complex or multi-party mediations and arbitrations" in his more than 30-year career.  (*Id.*)  During discovery in JAMS I, Ms. Graham received more than 80,000 pages of documents from Credit Suisse, Palantir, and Signac.  (*Id.*)  Respondent also deposed Credit Suisse AG employees in Switzerland and England. (*Id.*)

On March 5, 2018, the parties began a six-day final hearing.  (*Id.* ¶ 23.)  More than 300 exhibits were admitted into evidence.  (*Id.*)  Nine witnesses testified live, while two others testified by deposition.  (*Id.*)  The live witnesses included Petitioner Lara Warner, who is Credit Suisse AG's Chief Risk and Compliance Officer, and who flew from Zurich to New York to testify on a Sunday, at Respondent's request.  (*Id.*)  Ms. Graham herself likewise testified over three hearing days in both her own case-in-chief and in rebuttal—the vast majority of such testimony taking place during direct examinations by her own counsel.  (*Id.*)

On June 8, 2018, Arbitrator Young issued the JAMS I Award, a twenty-two page reasoned award in favor of CSFB and Palantir, rejecting every one of Ms. Graham's claims for relief.  (*Id.* ¶ 24.)  Arbitrator Young specifically rejected



(*Id.*)  He added that

by CSFB, Palantir, or Petitioner Credit Suisse AG. (*Id.*)

Arbitrator Young also denied Ms. Graham any relief regarding the allegation that

(*Id.* ¶ 25.)  During JAMS I, Credit Suisse admitted that, pursuant to the MSA under which it paid Signac $14.6 million for an irrevocable and perpetual license to use any and all Signac technology, Credit Suisse AG used some former Signac personnel, who were then employed by Credit Suisse, and some data aggregators that were in place at Signac to complete reviews of trades that were started at Signac prior to the termination of the MSA.  (*Id.*)  Credit Suisse steadfastly maintained, however, that those reviews were completed in January 2018, and that Credit Suisse AG made no use of anything that could be considered Signac intellectual property after that time.   (*Id.*) Arbitrator Young agreed, concluding that there was no evidence ████████████████████████

████████████████████████████████████████████████████████████████████

(*Id.*)

### C.    After losing JAMS I, Respondent pursues, and loses, a Sarbanes-Oxley whistleblower claim before OSHA arising out of the same chain of events.

Rather than promptly move to vacate the JAMS I Award in a court of competent jurisdiction, Ms. Graham turned her attention to yet another litigation she had filed in connection with Signac's dissolution.  (*Id.* ¶ 26.)  Specifically, in November 2017, while JAMS I was pending, Respondent filed a Sarbanes-Oxley whistleblower claim with the Occupational Safety and Health Administration ("OSHA") against CSFB, Palantir, Signac, and Credit Suisse Securities USA.  (*Id.*)

On July 26, 2018, after the JAMS I Award was issued, Ms. Graham provided OSHA investigators with the "Supplemental Declaration of Colleen A. Graham."  (*Id.* ¶ 27.)  In that Declaration, Ms. Graham raised many of the same allegations she made in JAMS I—and is now making in JAMS II—including that (1) she was ██████████████████████████████████

██████████████████████████████████████████████████ (2) Credit Suisse had

---

[1] Of note, when the pilot reviews were completed, it was concluded that all of the incidents that had been flagged for review by Signac failed to identify any actual trading violations.

███████████████████████████████████████████████████

████████ and (3) Credit Suisse's witnesses had provided ███████████████

████████████████████████ (*Id.*)

On April 23, 2019, after many months of investigating all of Ms. Graham's claims of retaliation, OSHA's Secretary of Labor dismissed Ms. Graham's SOX claims in full, finding that after investigation, OSHA was "unable to conclude that there is reasonable cause to believe that a violation of the statute occurred" or that Credit Suisse retaliated against Ms. Graham in any of the ways alleged.  (*Id.* ¶ 28.)  Ms. Graham has appealed those findings to an OSHA Administrative Law Judge.  (*Id.*)  A final hearing on what remains of that appeal, post motion to dismiss, has been set to start on March 8, 2021.  (*Id.*)

**D.      More than nine months after the JAMS I Award, Respondent files a Petition to Vacate in this Court.**

On March 8, 2019, more than nine months after receiving the JAMS I Award, Ms. Graham filed a Petition to Vacate the Award (the "Petition to Vacate").  (*Id.* ¶ 29.)  The petition sought to vacate the JAMS I Award for "fraud" and "misconduct" under N.Y. C.P.L.R. § 7511(b)(1)(i).  (*Id.*)  Ms. Graham's fraud and misconduct arguments were based on two slides from a Credit Suisse AG presentation during its 2018 Investor Day (the "Investor Day Slides").  (*Id.*)  According to Ms. Graham, those slides represented "new" evidence that was ████████████ until December 12, 2018.  (*Id.*)

The Investor Day Slides make no reference to Signac, BRM, or any other Signac-related tool.  (*Id.* ¶ 30.)  They merely contain nondescript timelines, commencing in May 2017, that refer to Trader Holistic Surveillance, or "THS"—a completely separate and proprietary trader surveillance tool created from scratch by Credit Suisse AG's own data scientists.  (*Id.*)  Even though she had already tried, and failed, to prove during JAMS I that Credit Suisse AG's THS tool

7

was really Signac's unfinished "BRM" tool, Ms. Graham raised that exact same argument once more in her Petition to Vacate.  (*Id.*)  She claimed that Credit Suisse AG's Investor Day Slides showed that it had "rolled out" THS as early as May 2017, thereby putting the lie to certain testimony from Credit Suisse witnesses in JAMS I, ███████████████████████████████ ███████████████  (*Id.*)  According to Ms. Graham, this inconsistency could only mean one thing:  that the "THS" referenced in the Investor Day Slides was not developed by Credit Suisse AG and, instead, had to be Signac's "BRM" tool in disguise.  (*Id.*)

Ultimately, Ms. Graham argued in the Petition to Vacate that (1) Credit Suisse was still engaged in the ██████████████████████████████ (2) Credit Suisse ████████████████████████████████ including ███████████████ ████████████ during JAMS I, and (3) two Credit Suisse witnesses had provided ██████ ████████████████████████ about these matters.  (*Id.* ¶ 31)

On June 6, 2019, the state court held a hearing on Ms. Graham's Petition to Vacate.  (*Id.* ¶ 32.)   After reviewing the Investor Day Slides, the state court rejected Ms. Graham's urged interpretation.  (*Id.*)  Instead, the state court found that, ██████████████████████ ████████████████████████████████████████████████ ██████████████████████████  (*Id.*)  Since there was no evidence that THS was even in existence, let alone in use, as of the time of JAMS I, the state court found nothing to suggest any inconsistency with any prior testimony—and had no need to reach Ms. Graham's allegation that THS is really Signac's BRM in disguise.  (*Id.*)  Additionally, the state court commented that there was no evidence that Credit Suisse (or the other respondents in JAMS I) engaged in fraud or provided any false testimony.  (*Id.*)

On June 21, 2019, the state court entered an order denying Ms. Graham's Petition to Vacate and confirming the JAMS I Award.  (*Id.* ¶ 33.)  On July 9, 2019, Respondent filed a notice appealing the State Court's denial of her Petition to Vacate.  (*Id.*)  After eight months and one extension of time, Respondent chose not to perfect her appeal.  (*Id.*)  Instead, she abandoned the appeal and allowed it to be dismissed by operation of 22 N.Y.C.R.R. § 1250.10(a).  (*Id.*)

### E.   Respondent files JAMS II which involves the same claims, allegations, and requests for relief as JAMS I.

On December 22, 2020, more than nine months after her appeal was dismissed, Ms. Graham filed JAMS II without any warning or explanation.  (*Id.* ¶ 34.)  As seen below, Respondent's JAMS II Notice of Claim expressly reasserts the same allegations of "misappropriation" and "continued use" that Arbitrator Young rejected in JAMS I; it repeats the same accusations of "concealed evidence" that were raised in JAMS I and the failed Petition to Vacate, and the same allegations of false testimony that was rejected by the state court in denying the Petition to Vacate; and it seeks the exact relief that was sought, but denied, in JAMS I.  (*Id.*)

<u>First</u>, Respondent's principal allegation in JAMS I was that CSFB and Palantir dissolved Signac in order ████████████████████████  (*Id.* ¶ 35.)  As part of that allegation, Respondent repeatedly claimed that Credit Suisse AG had used and was continuing to use Signac's technology, including the trader surveillance tool named BRM, without paying Signac for its use.  (*Id.*)

Ms. Graham makes those same allegations in JAMS II.  Her Notice of Claim alleges that Credit Suisse AG ██████████████████████████████████████████████ ███████  (*Id.* ¶ 36.)  Not only that, but Ms. Graham *admits* that her claims of misappropriation and use were litigated and rejected in JAMS I.  (*Id.*)  Her Notice of Claim in JAMS II *concedes* that, in JAMS I, Arbitrator Young ███████████████████████████████████

██████████████████████████████ and likewise found that ████████████████████████

███████████████████████████████ (*Id.*)  Ms. Graham also admits that JAMS

II is a direct attack on Arbitrator Young's adverse ███████████████ rulings in JAMS

I.  (*Id.*)  Indeed, the first paragraph of her Notice of Claim in JAMS II states that the arbitration

████████████████████████████████████████████ (*Id.*)

Second, Ms. Graham repeatedly accused CSFB and Credit Suisse AG in JAMS I of

"concealing" evidence of Credit Suisse AG's purported "continued use" and "misappropriation"

of Signac's technology after January 2018, and of providing "false testimony" that Credit Suisse

AG was no longer using Signac's BRM.  (*Id.* ¶ 37.)  She raised similar claims in the Petition to

Vacate, alleging that she had discovered evidence, such as the Investor Day Slides, suggesting that

Credit Suisse ████████████████████████████████████████████████

███████████████████████████████ (*Id.*)

It is undisputed that Ms. Graham's accusations that █████████████████████

████████████████████████████ were flatly rejected by both Arbitrator Young

in JAMS I, and by the state court on the Petition to Vacate.  (*Id.* ¶ 38.)  As the table below

illustrates, it is likewise incontrovertible that, in JAMS II, Ms. Graham is asserting those same

twice-rejected allegations that  Credit  Suisse  AG  █████████████████████████

████████████████████████████ of Signac's technology:



| PETITION TO VACATE | JAMS II |
|---|---|
| (Ex. 5, Petition to Vacate ¶ 55.) | (Ex. 9, JAMS II NOC ¶¶ 2– 4.) |

Worse, in furtherance of these JAMS II allegations, Ms. Graham once again relies on the very same interpretation of the very same Investor Day Slides that this Court reviewed and rejected when denying the Petition to Vacate. (*Id.* ¶ 39.)

Third, as the table below illustrates, a side-by-side comparison of the relief sought by Ms. Graham in JAMS I and JAMS II proves, yet again, that JAMS II is an impermissible collateral attempt to obtain the very relief she requested but was denied in JAMS I:

| JAMS I RELIEF | JAMS II RELIEF |
|---|---|
| A declaratory judgment that ▇▇▇ (Ex. 2, JAMS I ANOC at 22.) | A declaratory judgment that ▇▇▇ (Ex. 9, JAMS II NOC at 21.) |
| ▇▇▇ (Ex. 2, JAMS I ANOC at 24.) | ▇▇▇ (Ex. 9, JAMS II NOC at 21.) |



### F.   Procedural history of Petitioners' action to stay JAMS II.

On January 11, 2021, Petitioners filed in state court a petition to permanently stay the JAMS II arbitration as an impermissible collateral attack on the JAMS I Award in violation of Section 10 of the FAA. (*Id.* ¶ 41.) On January 14, 2021, Respondent filed a notice removing the Petitioner's state court action to this Court. (*Id.* ¶ 42.)

Removal jurisdiction was lacking for a variety of reasons. (*Id.* ¶ 43.) But Petitioners had no objection to having this Court decide whether JAMS II was an improper collateral attack on JAMS I. (*Id.*) Accordingly, on February 1, 2021, Petitioners timely filed with this Court the papers necessary to file certain confidential information under seal in connection with the petition to permanently stay the JAMS II arbitration. (*Id.* ¶ 44.) Following the Court's disposition of the request to seal certain information, this Petition to Enjoin Arbitration was timely filed with this Court. (*Id.*)

## ARGUMENT

As a threshold matter, this petition is properly addressed to the Court rather than an arbitral tribunal.  It is well settled that district courts have the power to enjoin arbitration proceedings under the § 4 of the FAA.  *J.P. Morgan Sec.*, 712 F. Supp. 2d at 76 n.38; *see also In re Am. Exp. Fin. Advisors Sec. Litig.*, 672 F.3d 113, 141 (2d Cir. 2011) (holding that the power to enjoin an arbitration under the FAA "is the concomitant of the power to compel arbitration where it is present.").  Though the "FAA expresses a national policy favoring arbitration," courts will use this power and "intervene" in an arbitration if "the 'ultimate objective is to rectify the alleged harm' a party suffered from an unfavorable arbitration award 'by attempting to arbitrate its claims in a separate second arbitration proceeding.'" *Arrowood*, 2015 WL 4597543 at *5 (quoting *Decker v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 205 F.3d 906, 910–11 (6th Cir. 2000)).  And whether a subsequent arbitration proceeding constitutes such a "collateral attack" on a previous proceeding is a question for the courts, not an arbitration tribunal.  *Id.*; *see also Oppenheimer*, 129 A.D.3d at 622 ("[T]he question of whether a second arbitration proceeding is an impermissible collateral attack of an arbitration award in the first arbitration proceeding is not a question of arbitrability, but is a legal question to be determined by the court.").

The "collateral attack" doctrine specifically precludes a party from using a subsequent arbitration proceeding as a means to challenge or otherwise modify a final award in a prior arbitration.  *See Arrowood Indem.*, 2015 WL 4597543 at *5–6; *see also Gulf LNG Energy*, 242 A.3d at 584 ("Settled federal and state precedent recognizes these [subsequent arbitration] proceedings as improper end runs around the FAA's exclusive review process. . . . [T]hey are improper collateral attacks on the earlier final award.").  The doctrine exists because Section 10 of the FAA provides "the ***exclusive*** means of addressing and redressing wrongdoing in an arbitration

13

proceeding." *Arrowood Indem.*, 2015 WL 4597543 at *5 (citation omitted).  And Section 10 of

the FAA expressly delegates to courts, not arbitral tribunals, the task of reviewing challenges to

arbitration awards—namely, through seeking vacatur.  *Gulf LNG Energy*, 242 A.3d at 583–84.

The FAA's scheme is "designed to afford an arbitration award finality in a timely fashion,

promoting arbitration as an expedient method of resolving disputes without resort to the courts."

*Prudential Sec. Inc. v. Hornsby*, 865 F. Supp. 447, 450 (N.D. Ill. 1994).

 As a result, "arbitral mulligans are forbidden by the FAA, which is 'the exclusive remedy

for challenging acts that taint an arbitration award, whether a party attempts to attack the award

through judicial proceedings or through a separate second arbitration.'"  *Arrowood Indem.*, 2015

WL 4597543 at *5 (citing *Decker*, 205 F.3d at 911).  Because Section 10 "would be eviscerated if

it were only an optional way to modify an arbitration award, an attempt to modify an award by a

route or mechanism other than section 10" cannot be tolerated.  *Prudential Sec.*, 865 F. Supp. at

451.  Accordingly, where a current arbitration "is properly characterized as an attempt to modify

the [prior] award, then it ***must be enjoined*** because the current arbitration encroaches upon an area

governed exclusively by section 10 of the Act."  *Id.* at 450 (emphasis added).[2]

Here, it is clear that Ms. Graham's JAMS II action is an improper collateral attack on the

final award in JAMS I.  Indeed, it is not just an attempt to "modify" the JAMS I Award, which

itself is improper under the FAA; it is an effort to redo that entire arbitration action and therefore

---

[2] Though Courts that have enjoined arbitrations under the collateral attack doctrine have not analyzed the issue under the traditional standard for seeking a permanent injunction—a showing of the absence of an adequate remedy of law and irreparable harm—it is worth noting that standard is also satisfied here.  Courts have held that a party lacks a remedy of law and suffers irreparable harm per se where a party is compelled to arbitrate "a matter not properly subject to arbitration." *Citigroup Glob. Markets Inc. v. VCG Special Opportunities Master Fund Ltd.*, No. 08-CV-5520BSJ, 2008 WL 4891229, at *2 (S.D.N.Y. Nov. 12, 2008), *aff'd*, 598 F.3d 30 (2d Cir. 2010); *see also Goldman, Sachs & Co. v. N. Carolina Mun. Power Agency No. One*, No. 13 CIV. 1319 PAC, 2013 WL 6409348, at *8 (S.D.N.Y. Dec. 9, 2013).

"must be enjoined." *Id.* This Court's decision in *Arrowood Indemnity Company v. Equitas Insurance Limited* is just one of many cases directly on point. 2015 WL 4597543. There, the parties to an insurance contract had engaged in an arbitration that resulted in a final award in favor of claimant Arrowood. *Id.* at *2. In the award, the panel adopted Arrowood's urged interpretation of a disputed provision of the parties' insurance contract. *Id.* Following the arbitration, respondent Equitas claimed to have obtained a document from Arrowood in discovery in another matter which, according to Equitas, demonstrated that Arrowood's interpretation of the provision was "disingenuous." *Id.* at *3. Equitas then filed a second arbitration, asking the panel in that case to adopt a different interpretation of the disputed clause than the panel in the first action. *Id.* Arrowood filed an action in federal court asking the court to enjoin the second arbitration as an impermissible collateral attack on the award in the first action. *Id.* at *4. In response, Equitas argued that it should be permitted to proceed with arbitration because it was a different claim than was brought in the original arbitration, and because Arrowood had "intentionally concealed the document to bolster its position and that this constituted fraud and misconduct before the Panel." *Id.* at *3. The trial court rejected Equitas's arguments and granted Arrowood's action to permanently enjoin the second arbitration, finding that the interpretation of the insurance agreement was "at the heart of the Panel's work and decision in the First Arbitration," and the "FAA does not permit a second arbitration demand to be used to nullify an arbitral award, in whole or in part." *Id.* at *6.

The result should be the same here. Ms. Graham has repeatedly acknowledged that a central issue in JAMS I was whether Credit Suisse AG had misappropriated Signac's technology and was continuing to use it. (Ex. 9, JAMS II NOC ¶ 2.) She even admits that, in JAMS I, Arbitrator Young expressly found that ████████████████████████████████████

of Signac's technology and, in fact, blames that finding for Arbitrator Young's allegedly erroneous conclusion that Signac was not dissolved in "bad faith." (*Id.* ¶ 34.) Yet in JAMS II, Ms. Graham makes those same allegations about Credit Suisse's alleged misappropriation and use of Signac's technology. (Ex. 9, JAMS II NOC ¶¶ 1–3, 48–49, 57, 64, 70, 76–78, 81–83.) In essence, she expressly seeks to reverse the ruling in JAMS I that there was no evidence of misappropriation or impermissible continued use by Credit Suisse AG. (*Compare id. with* Ex. 1, JAMS I Award at 17.) And worse still, the primary relief Ms. Graham seeks in JAMS II is the exact relief she was denied in JAMS I. (*Compare* Ex. 9, JAMS II NOC at 21–22 *with* Ex. 2, JAMS I ANOC at 22–24.) In summary, Ms. Graham's patent attempt to use a "second arbitration demand to [] to nullify an arbitral award" in JAMS I is precisely what Arrowood held may not be done under the FAA. *Arrowood Indem.*, 2015 WL 4597543 at *6; *see also Prudential Sec.*, 865 Supp. at 450 (noting that if an arbitration proceeding "is properly characterized as an attempt to modify the [] award, then it must be enjoined").

Ms. Graham's claims of subsequently discovered evidence that was fraudulently "concealed" do not alter the conclusion that JAMS II is an impermissible collateral attack on the final award in JAMS I. (*See* Ex. 9, JAMS II NOC ¶¶ 1–3.) In addition to the fact that those claims were litigated and rejected in both JAMS I and on the Petition to Vacate, those allegations, even if credited, are irrelevant as a matter of law here. As demonstrated in *Arrowood*, there is no exception in the FAA or the applicable case law allowing a party to bring an arbitration collaterally attacking an earlier arbitration award based on the subsequent discovery of relevant evidence, even if it is alleged that such evidence was "intentionally concealed" in the prior action. *Arrowood Indem.*, 2015 WL 4597543 at *3, *6 (rejecting claim that plaintiff could bring a second arbitration collaterally attacking a prior arbitration because respondent had purportedly "concealed" evidence

16

in the prior case); *see also Prudential Sec.*, 865 F. Supp. at 452 (rejecting argument that claimant "may prosecute his NASD claim because Prudential's fraudulent concealment prevented him from finding the smoking gun within the three month time limit for section 10 motions" under the FAA).

Ms. Graham must be aware of this body of law because she raised all of these issues in her Petition to Vacate the JAMS I Award and then filed a notice to appeal this Court's Order denying that petition.  What she is not allowed to do, however, is to switch horses midstream by abandoning her FAA-sanctioned challenge to an arbitration award and, instead, commence a second arbitration as a means to contest the adverse award from the first arbitration.   That is exactly what Section 10 of the FAA is designed to prevent.

Nor, for that matter, may Ms. Graham avoid the strictures of the collateral attack doctrine and the FAA by simply naming new defendants in JAMS II.  Courts are clear that a party may not "transform what would ordinarily constitute an impermissible collateral attack into a proper independent direct action by changing defendants." *Corey*, 691 F.2d at 1213.  In any event, any argument by Ms. Graham that she can avoid an injunction because she added Credit Suisse AG and Ms. Warner as respondents in JAMS II, alongside Signac, truly relies on a distinction without a difference.  Credit Suisse AG is the parent of CSFB, which was a 50% owner of Signac, and was Signac's first and only client.  Ms. Warner is not only an officer of Credit Suisse AG, but was one of the Signac board members who voted in favor of dissolution, the circumstances of which undeniably go to the heart of both JAMS I and II.

At bottom, for purposes of the collateral attack doctrine, it does not matter whether the allegations in JAMS II sound in fraud or concealment.  Nor does it matter whether all of the respondents are exactly the same in JAMS I and JAMS II, as the collateral attack doctrine, which springs from the FAA, is not an effort to codify or duplicate the doctrine of *res judicata*.  Rather,

what matters is whether JAMS II is an attempt to modify or otherwise challenge the Award in JAMS I.  If it is, then it must be enjoined.

There is no question that JAMS II represents Ms. Graham's unabashed attempt to undo the finding in JAMS I that Credit Suisse AG did not misappropriate or improperly use any Signac technology, and to obtain the very relief she was denied in JAMS I.  As such, labels and rhetoric aside, Respondent's Notice of Claim in JAMS II "is properly characterized as an attempt to modify the [] award" in JAMS I and it "must be enjoined." *Prudential Sec.*, 865 F. Supp. at 450.

## CONCLUSION

For the foregoing reasons, Petitioners Credit Suisse AG and Lara Warner respectfully request that the Court grant this application by entering an order (i) enjoining the JAMS II arbitration action, and (ii) awarding such other and further relief as the Court deems just and proper.

Dated:      February 2, 2021
            New York, New York

Respectfully submitted,

**LATHAM & WATKINS LLP**

By: _____

Joseph Serino, Jr.
Kuan Huang
Nathan Taylor
885 Third Avenue
New York, NY 10022
Telephone: (212) 906-1200
Email:  joseph.serino@lw.com
         kuan.huang@lw.com
         nathan.taylor@lw.com

*Attorneys for Credit Suisse AG and Lara Warner*