UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:__4/7/2021___
```

-------------------------------------------------------------------X
                         :

CREDIT SUISSE AG and LARA WARNER,     :

                Petitioners,     :

                     :           21-cv-951 (LJL)

       -v-                :

                     :       OPINION & ORDER

COLLEEN A. GRAHAM,             :

               Respondent.    :

-------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

      Petitioners Credit Suisse AG ("CS") and Lara Warner ("Warner") petition for an order enjoining an arbitration. Respondent Colleen A. Graham ("Respondent" or "Graham") cross-moves for an order compelling arbitration. For the following reasons, Petitioners' application is denied and Respondent's motion is granted.

## BACKGROUND

### A.    Signac

      This action grows out of a failed joint venture. Graham is the former Chief Supervisory Officer and a member of the Board of Managers of Signac LLC ("Signac" or the "Company"), an unsuccessful 50-50 joint venture formed between Credit Suisse First Boston Next Fund, Inc. ("CSFB") and Palantir Technologies Inc. ("Palantir"). Dkt. No. 1 ¶ 2 (the "Petition" or "Pet."). CS is the parent corporation of CSFB. *Id*. ¶ 7. Signac was formed to develop and market an "Enhanced Trading Oversight" solution ("ETOS")—a technology and services platform that would allow banks to more effectively monitor and combat inappropriate trading. *Id.* ¶ 13. It was governed by the Second Amended and Restated Limited Liability Company Agreement,

effective as of February 29, 2016 (the "LLC Agreement").  *Id.*  Pursuant to the LLC Agreement, Signac was overseen by a four-member Board of Managers.  *Id.* ¶ 14.  In addition to Graham, the Board of Managers included Warner, who was CSFB's representative on the Board of Managers of Signac.  *Id.*  The Board also included Sean Hunter, Signac's Chief Information Officer, and Matt Long, a representative of Palantir.  *Id.*  Graham and Hunter received ownership interests in Signac.  *Id.* ¶ 15.

Signac's first and only client was CS.  *Id.* ¶ 16.  Signac and CS signed a Master Services Agreement ("MSA") pursuant to which Signac granted CS a permanent license to any trader surveillance technology created by Signac.  *Id.*  Sometime prior to June 2017, CS exercised its contractual and unilateral rights to terminate the MSA.  *Id.* ¶ 17.  In the wake of that decision, in June 2017, Signac's Board of Managers approved Signac's dissolution.  *Id.* ¶ 18.  Graham voted against the dissolution.  *Id.*  All other managers voted in favor of it.  *Id.*

Two arbitration proceedings arising out of these events are at issue in this case.

**B.    JAMS I**

On or about October 25, 2017, Graham filed an arbitration claim in JAMS on behalf of herself and Signac against CSFB and Palantir, as well as against Signac as nominal defendant. *Id.* ¶ 19.  Graham subsequently amended her claim on or about November 20, 2017.  *Id.*

The claims were filed pursuant to Section 14.7(b) of the LLC Agreement, which provides that any dispute that "arises from or relates to this Agreement or the breach thereof" shall be resolved through an arbitration administered by JAMS in accordance with its then-in-effect Comprehensive Arbitration Rules and Procedures.  Dkt. No. 20-2 at 4.

Graham challenged the dissolution of the Company, alleging that CSFB and Palantir breached the LLC Agreement by improperly and inappropriately dissolving Signac, failing to

maximize its value to all of its members, violating certain restrictive covenants found within the LLC Agreement and failing to act in good faith.  Dkt. No. 20-2.  She also alleged that CSFB had breached the restrictive covenants in the LLC Agreement and had been unjustly enriched by the wrongful appropriation of certain Signac intellectual property.  *Id.*  One of the restrictive covenants stated that "the Class A/B Members (and former Class A/B Members) [i.e., CSFB and Palantir] shall not, and shall cause their respective controlled Affiliates not to, without the prior written consent of the Company, directly or indirectly, (1) engage in a business that provides Enhanced Trading Oversight Solutions ["ETOS"] other than through the Company Parties."  Dkt. No. 20-2 at 20.  Graham sought an injunction against CSFB and Palantir selling ETOS to third parties and also claimed that CSFB had used ETOS for a time for internal purposes in violation of the restrictive covenant and, in the case of CS, without paying a fee.  Dkt. No. 20-2 at 19-20.  The particular tool Graham alleged CS used was a trader surveillance tool called BRM.  Pet. ¶ 35.  Graham did not name CS or Warner as respondents or seek relief as against them.  *Id.*

The parties conducted a six-day hearing in JAMS I beginning on March 5, 2015 before Michael D. Young ("Arbitrator Young").  *Id.* ¶ 22.  On June 8, 2018, the arbitrator issued an award in JAMS I, denying and dismissing with prejudice all of the claims made by Graham both on behalf of herself and on behalf of Signac and resolving all of the claims in the arbitration.  *Id.* ¶ 24.  In the course of his decision, Arbitrator Young made clear that he was not adjudicating any claim against Warner for breach of fiduciary duty.  Dkt. No. 20-2 at 12 n.12.   In the course of his ruling that the decision to dissolve Signac was not wrongful, Arbitrator Young stated: "the decision to dissolve Signac was based on a perceived lack of performance and other legitimate business considerations rather than on some bad faith reason such as wanting to appropriate the product" and that "appropriation of the product does not appear to have occurred."  *Id.* at 17.

With respect to the claim that CS had continued to use ETOS in violation of the MSA, Arbitrator Young stated that CS "is not a party before me and therefore it is not clear that I have the authority to adjudicate a claim against it." *Id.* at 21.  Arbitrator Young stated that CS had continued to use the ETOS after its termination of the MSA improperly and without paying fees. However, there was no basis for him to award damages against CSFB for CS's breach of the MSA.  He concluded with the observation that CS was no longer using ETOS and therefore there was no basis to award injunctive relief against CSFB "based on CS[']s past use of [ETOS]." *Id.* at 23.

CSFB did not bring an action to confirm the arbitration award.  Instead, on March 8, 2019, Graham filed a petition to vacate the award in New York state court pursuant to N.Y. CPLR § 7511(b)(1)(i), seeking to vacate the award on grounds of fraud or misconduct. Pet. ¶ 29. On June 6, 2019, the state court held a hearing on Graham's petition to vacate.  *Id.* ¶ 32.  At the hearing, the state court found that Graham had not put forth evidence that suggested any inconsistency with any prior testimony.  *Id.*  On June 21, 2019, the state court entered an order denying Graham's petition to vacate and confirming the JAMS I award.  *Id.* ¶ 33.  Graham filed a notice of appeal on July 9, 2019, appealing the state court's denial of her petition to vacate. However, Graham chose not to perfect the appeal and it was dismissed by operation of 22 N.Y. CRR § 1250.10(a).  *Id.*

## C.     JAMS II

On December 22, 2020, Graham filed a second arbitration in front of JAMS ("JAMS II"). *Id.* ¶ 34; Dkt. No. 20-3.  JAMS II was brought against CS and Warner, and against Signac as a derivative claimant and, in its capacity as an alter ego of CS, as a respondent.  She invoked Section 20.2(b) of the MSA.  Dkt. No. 20-3 at 4.  That section provides: "If a dispute arises from

or relates to this Agreement or the breach thereof, . . . the dispute shall be settled by arbitration administered by Judicial Arbitration and Mediation Services, Inc. ('JAMS') in accordance with its then-in-effect Comprehensive Action Rules." *Id*.

Graham bases her claim in JAMS II on the Arbitrator's finding in JAMS I that CS had used ETOS wrongfully and on documents that she claims shows that the wrongful use was not only "for a limited time" as Arbitrator Young had concluded. Dkt. No. 20-4. Graham alleges that CS breached the MSA, Dkt. No. 20-4 at 17, and that Warner breached her fiduciary duties as a member of Signac, *id*. at 18. Graham further alleges that Trader Holistic Surveillance ("THS"), a surveillance tool used internally by CS, was in fact Signac's BRM tool, used under a different name. Pet. ¶ 30. She claims that CS breached the MSA by failing to pay required license fees and to act in good faith, including by attempting to conceal its continued use of THS, misappropriating THS, and using, modifying, and developing the same without a license or authorization. Graham also asserts claims against CS for unjust enrichment, conversion, breach of the duty of good faith and fair dealing under the MSA, and aiding and abetting Warner's breach of fiduciary duty. The sixth claim seeks an accounting and the seventh claim seeks a declaratory judgment.

The single claim against Warner alleges that she breached her fiduciary duties as a manager of Signac by, among other things, aiding and abetting CS's misappropriation or exploitation of THS, depriving Graham and other Class C members of Signac of the fair value of their equity, and failing to maximize the value of Signac. Dkt. No. 19 at 11.

In the JAMS II arbitration, Graham claims that documents produced in a Sarbanes-Oxley ("SOX") investigation instigated by her after the conclusion of the JAMS I arbitration show that testimony given at the JAMS I proceeding by Warner, as CS's Chief Compliance and Regulatory

Affairs Officer ("CCRO") and by CS's Global Head Core Compliance, was false and

misleading.  *Id.* at 12.[1]  Graham also claims that Warner breached her fiduciary duties to Signac

by facilitating and then concealing CS's use of the technology in violation of its agreements with

Signac, that THS was rolled out globally in May 2017, and that CS continued to use and develop

THS after its release.  *Id.* at 11.

## PROCEDURAL HISTORY

On January 11, 2021, Petitioners filed in state court a petition to permanently stay the

JAMS II arbitration as an impermissible collateral attack on the JAMS I award in violation of

Section 10 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, *et seq.*  On January 14, 2021,

Graham filed a notice removing the state court action to this court.  No. 21-cv-363, Dkt. No. 1

(S.D.N.Y. Jan. 14, 2021).

Recognizing that the court did not have removal jurisdiction, but did have original

diversity jurisdiction under 28 U.S.C. § 1332, and with both sides deciding that they wanted this

Court to decide the issues presented, on or about February 3, 2021, Petitioners timely filed this

petition to enjoin arbitration.

## DISCUSSION

### A.    Respondent's Motion to Compel

The Court addresses first the question whether the second arbitration falls within the

scope of an enforceable arbitration agreement.  In the absence of such an enforceable arbitration

---

[1] In November 2017, while JAMS I was pending, Graham filed a Sarbanes-Oxley whistleblower complaint with the Occupational Safety and Health Administration ("OSHA") against CSFB, Palantir and Signac, making allegations similar to those presented in the arbitrations.  The OSHA investigator dismissed Graham's SOX claims on April 23, 2019, but Graham's appeal of those findings is pending before the Office of Administrative Law Judges (2019-SOX-00040).  Dkt. No. 19 at 13 n.4; *see also* Dkt No. 1. ¶¶ 26-28.

agreement governing the second arbitration, Respondent would not need to participate in the second arbitration and its application for a stay of the arbitration would be moot.

The "FAA compels judicial enforcement of . . . written arbitration agreements." *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 111 (2001).  Under the FAA, a "written provision in any . . . contract . . . evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  "Section 2 embodies [a] national policy favoring arbitration." *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006).  "By its terms the [FAA] leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 218 (1985).

In deciding a motion to compel arbitration, courts apply a standard "similar to that applicable for a motion for summary judgment." *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74 (2d Cir. 2017).  "Where the undisputed facts in the record require the matter of arbitrability to be decided against one side or the other as a matter of law, [courts] may rule on the basis of that legal issue and avoid the need for further court proceedings." *Id*.  The first step of a court's inquiry is "to ascertain whether the parties entered into an agreement to arbitrate." *Monisoff v. Am. Eagle Invs., Inc.*, 927 F. Supp. 137, 137-38 (S.D.N.Y. June 10, 1996); *see also First Options of Chi. Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) ("[C]ourts generally . . . should apply ordinary state-law principles that govern the formation of contracts.").

There is no dispute here that the arbitration clause was valid and enforceable.  The MSA contains an arbitration agreement which provides that all disputes arising out of the Agreement

will be submitted to arbitration.  Dkt. No. 13-1 § 20.2(b).  Respondent agrees that "this is not a dispute over arbitrability, or where the merits of JAMS II should be heard."  Dkt. No. 26 at 8; *see also id.* at 6 ("Petitioners . . . are not arguing that the parties do not have an arbitration agreement or that they have not agreed to arbitrate the disputes raised in JAMS II.").  Further, the JAMS Comprehensive Arbitration Rules, which are adopted by the MSA, state that arbitrability disputes are to be submitted to and ruled on by the arbitrator.  Dkt. No. 13 at 9-10 (quoting JAMS Comprehensive Arbitration Rule 11(b)) ("Jurisdictional and arbitrability disputes, including disputes over the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought, and who are proper Parties to the Arbitration, shall be submitted to and ruled on by the Arbitrator.  The Arbitrator has the authority to determine jurisdiction and arbitrability issues as a preliminary matter.").  Thus, the motion to compel should be granted, unless Petitioners' motion to stay is also granted.

### B.  Petitioners' Motion to Stay

The second question is whether Petitioners' application for a stay should be granted. Petitioners argue that the issues raised in JAMS II have already been arbitrated and resolved in JAMS I, and that, accordingly, JAMS II is an impermissible collateral attack on JAMS I.  Dkt. No. 26 at 6.[2]

Petitioners point to a number of cases in which courts have held that a second arbitration cannot collaterally attack the final determination in the first arbitration, and argue that the

---

[2] Petitioners do not identify the specific jurisdictional hook giving the Court authority to stay an arbitration, but the courts have found such authority may exist under the All Writs Act.  *See In re Am. Express Fin. Advisors Sec. Litig.*, 672 F.3d 113, 141 n.20 (2d Cir. 2011) (leaving open the question whether the All Writs Act might give a district court "the authority to enjoin arbitration to prevent re-litigation.") (quoting *Kelly v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 985 F.2d 1067, 1069 (11th Cir. 1993)).

collateral attack doctrine "is not a question or arbitrability, but is a legal question to be determined by the court." *Oppenheimer & Co v. Pitch*, 15 N.Y.S.3d 307, 308 (1st Dep't 2015). This line of cases begins with the Sixth Circuit's opinion in *Decker v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 205 F.3d 906 (6th Cir. 2000). In *Decker*, an investor who had won an award in an arbitration proceeding relating to a securities case brought a suit against the same investment firm, making tort and contract claims based on allegations that the firm had interfered with the arbitrators during the arbitration. The district court confirmed the arbitration award and the investor, while her appeal of the district court's decision was still pending, filed a second claim for arbitration. The district court granted the investment firm's motion to enforce the judgment by enjoining the investor from proceeding with the second arbitration. The investor appealed, and the Sixth Circuit consolidated the two appeals.

The Sixth Circuit first addressed the investor's appeal from the dismissal of her state law contract and tort claims. The court observed that a state law case "seeking damages for an alleged wrongdoing that compromised an arbitration award and caused the party injury, . . . is no more, in substance, than an impermissible collateral attack on the award itself." *Id.* at 910 (quoting *Corey v. N.Y. Stock Exchange*, 691 F.2d 1205, 1211-12 (6th Cir. 1982)). The prejudice to plaintiff stemmed not from Merrill Lynch's interference with the arbitration "but instead resulted from the impact of this action on the arbitration award." *Id.* The court accordingly reasoned that the state law claims were attacks upon the arbitration award itself, and that such claims could not be brought in court under state law because "the FAA is the exclusive means of challenging an arbitration award." *Decker*, 205 F.3d at 910. Because the investor's "ultimate objective . . . [was] to rectify the alleged harm she suffered by receiving a smaller arbitration award than she would have, . . . [she] should have filed a motion to vacate the arbitration award

under the FAA." *Id*.

The court then turned to the defendant's motion for an injunction barring the plaintiff's second arbitration claim. *Id*. at 911. The court noted that the issue whether a party could pursue allegedly independent claims through a second arbitration proceeding was "one of first impression in this circuit[,]" and that it had not "found much law addressing this issue in other federal courts." *Id*. Nonetheless, the court held that the injunction of the second arbitration was warranted:

> We believe that it is logical to extend our holding in *Corey* to Decker's claims presented in a second arbitration. The FAA provides the exclusive remedy for challenging acts that taint an arbitration award whether a party attempts to attack the award through judicial proceedings or through a separate second arbitration. It would be a violation of the FAA to allow Decker to arbitrate the very same claims that we have determined constitute an impermissible collateral attack when previously presented for adjudication by a court. Decker may not bypass the exclusive and comprehensive nature of the FAA by attempting to arbitrate her claims in a separate second arbitration proceeding.

*Id*. It did not cite any law in support of that conclusion.

A few courts have since adopted the *Decker* holding, albeit not without dissent. In *Gulf LNG Energy, LLC v. Eni USA Gas Marketing LLC*, 242 A.3d 575 (Del. 2020), the Delaware Supreme Court held that "[s]ettled federal and state precedent recognizes [that arbitral] follow on proceedings [are] improper end runs around the FAA's exclusive review process. In the words of those cases, they are improper collateral attacks on the earlier final award." 242 A.3d at 584. The court relied on *Decker* and the handful of other cases discussed herein. The court also relied on language in the arbitration agreement that "'[t]he award of the arbitral tribunal shall be final and binding' and they 'waive[d] any right to appeal from or challenge an arbitral decision or award . . . except with respect to the limited grounds for modification or non-enforcement provided by an applicable arbitration statute or treaty.'" *Id.* at 587. Thus, the court concluded

"[a]fter the parties completed an arbitration, they channeled all challenges to an arbitration award to the courts through the FAA review process" and that the follow-on arbitration "circumvent[ed] the contractually-agreed FAA review procedure."  *Id.*  Justice Vaughn dissented, concluding that, under the broad arbitration agreement at issue, the question of the claim preclusive effect of the first arbitration should be remitted to the arbitrators to decide.  *Id.* at 592.

In *Oppenheimer*, the Appellate Division for the First Department reversed the trial court's order granting a motion to compel an arbitration involving a party's alleged failure to disclose to its adversary certain documents during a prior arbitration, ruling that "the question whether a second arbitration was an impermissible collateral attack was a legal question to be resolved by the court" and that therefore the court should determine whether the second arbitration was "an unlawful collateral attack on the first arbitration proceeding" before granting a motion to compel.  *Oppenheimer*, 15 N.Y.S.3d at 308-09.

In *Arrowood Indemnity Co. v. Equitas Insurance Ltd.*, 2015 WL 4597543 (S.D.N.Y. July 30, 2015), a court in this District rejected an attempt by the losing party in the first arbitration to use the language of the confirmed arbitration award effectively to launch a second arbitration to unwind the effects of its loss.  The court agreed with the Sixth Circuit that "arbitral mulligans are forbidden by the FAA," because the FAA contains the exclusive remedy for challenging an arbitral award.  2015 WL 4597543, at *5; *see also Prudential Sec. Inc. v. Hornsby*, 865 F. Supp. 447, 451 (N.D. Ill. 1994) ("Because the policies behind section 10 would be eviscerated if it were only an optional way to modify an arbitration award, an attempt to modify an award by a route or mechanism other than section 10 must be enjoined.").

The Court respectfully disagrees that these decisions remain good law.  Arbitration is a

creature of contract and the FAA instructs the federal courts to defer to arbitration agreements

enshrined in contract.  "[A] provision regarding the finality of arbitration awards is a creature of

contract and, like any other contractual provision that is the subject of dispute, it is within the

province of arbitration unless it may be said 'with positive assurance' that the parties sought to

have the matter decided by a court."  *John Hancock Mut. Life Ins. Co. v. Olick*, 151 F.3d 132,

139 (3d Cir. 1998) (quoting *Loc. 103 of the Int'l Union of Elec., Radio & Machine Workers v.

RCA Corp.*, 516 F.2d 1336, 1340 (3d Cir. 1975)).  Moreover, a court's role in determining

whether to compel or enjoin an arbitration is typically limited to analysis of the agreement.  *See,

e.g.*, *id.* ("[T]he judicial inquiry before compelling or enjoining arbitration is narrow, and the

FAA authorizes the district court to explore only two threshold questions in considering a

demand for arbitration: (1) Did the parties seeking or resisting arbitration enter into a valid

arbitration agreement? (2) Does the dispute between those parties fall within the language of the

arbitration agreement?").  Where, as here, the parties clearly and unmistakably agree that the

arbitrators are to determine the threshold question of arbitrability, the court's role is even more

limited.  "[T]he courts must respect the parties' decision" and refer the parties to arbitration even

if the claim for arbitration is "wholly groundless."  *Henry Schein, Inc. v. Archer & White Sales,

Inc.* 139 S. Ct. 524, 531 (2019).  Furthermore, it is established that "procedural questions [are]

presumptively *not* for the judge, but for an arbitrator, to decide."  *Howsam v. Dean Witter

Reynolds, Inc.*, 537 U.S. 79, 84 (2002); *Pacelli v. Augustus Intelligence, Inc.*, 459 F. Supp. 3d

597, 612 (S.D.N.Y. 2020).

It follows that parties may agree, consistent with the FAA, to allow an arbitrator to

determine in a second arbitration whether a party's prior conduct in an earlier arbitration or any

other dispute resolution forum was wrongful and that, consequently, for that reason or any other

reason, the findings made in the earlier arbitration should not be honored.  Such an agreement would do no violence to the policy or language of the FAA.  If, for example, the arbitrator determined that wrongful conduct infected the first proceeding, the arbitrator would relieve the losing party from the effect of that proceeding.  If the arbitrator determined that there was no such wrongful conduct or that whatever wrongful conduct occurred did not—under the operative agreements—warrant reconsidering the earlier decision, the arbitrator would honor those agreements and so rule.  In either case, the decision would be for the arbitrator whether the parties had agreed to let the parties reopen the result of an earlier arbitration in a later arbitration, much like when a party challenging a judgment entered in federal court can, under limited circumstances, ask the court for relief from that judgment.  *See* Fed. R. Civ. P. 60(b).  The role of the federal court when a party files such a second arbitration is limited.  The question for the Court is not whether the second arbitration constitutes a collateral attack on the first arbitration, but instead whether the second arbitration falls within the terms of a valid arbitration agreement. If the dispute falls within the scope of the agreement, then the court should compel arbitration and leave to the arbitrator the question whether the second arbitration constitutes an impermissible collateral attack.

The Second Circuit reached a similar conclusion in *Citigroup, Inc. v. Abu Dhabi Investment Authority*, 776 F.3d 126 (2d Cir. 2015).  There, while an arbitration award was awaiting confirmation by the district court, one party to the arbitration served the other with a notice for a second arbitration.  The responding party sought to enjoin the second arbitration "on the ground that [the] new claims were barred by the doctrine of claim preclusion, or *res judicata*, because they were or could have been raised in the first arbitration."  *Id*. at 128.  The district court subsequently confirmed the first arbitration award.  On appeal, the Second Circuit

concluded that the resolution of the claim-preclusive effect of the judgment should be left to the

arbitrator in the second arbitration:

> The FAA's policy favoring arbitration and our precedents interpreting that policy
> indicate that it is the arbitrators, not the federal courts, who ordinarily should
> determine the claim-preclusive effect of a federal judgment that confirms an
> arbitration award. . . . We reason from our prior decisions interpreting the FAA that
> the determination of the claim-preclusive effect of a prior federal judgment
> confirming an arbitration award is to be left to the arbitrators.

*Id.* at 131.

Although the challenge to the second arbitration in *Abu Dhabi* was framed in the

language of whether the court or the arbitrator should determine the claim-preclusive effect of an

earlier award and not whether the second arbitration constituted an impermissible collateral

attack, the same principles apply here.  The *Abu Dhabi* court reasoned that "claim preclusion was

. . . a legal defense to the opposing party's claims and, as such was 'itself a component of the

dispute on the merits.'"  *Id.* at 131 (quoting *Nat'l Union Fire Ins. Co. of Pittsburgh v. Belco

Petroleum Corp.*, 88 F.3d 129, 135-36 (2d Cir. 1996)).[3]  In other words, it is not for the federal

courts on a motion to compel or stay arbitration to determine whether an earlier arbitration

necessarily determined an issue raised in a second arbitration.  If that is so, it follows logically

that it is also not for a federal court to determine whether the second arbitration is an

impermissible collateral attack on the first arbitration.  For, as Respondent's papers make clear,

the second arbitration could only be a collateral attack on the first arbitration (and therefore a

---

[3] Graham argues that the preclusive effect of a prior award is a question of arbitrability.  This
argument is squarely foreclosed by the Second Circuit's decisions in *Belco* and *Abu Dhabi*.  *See
Abu Dhabi*, 776 F.3d at 131 ("In [*Belco*], we reasoned that claim preclusion was not a question
of arbitrability."); *Belco*, 88 F.3d at 135 ("The preclusion issue is not . . . a disagreement over
'whether [the parties] agreed to arbitrate the merits' of their dispute.  Belco's claim of preclusion
is a legal defense to [Plaintiff's] claim.") (quoting *First Options of Chi., Inc. v. Kaplan*, 514 U.S.
938, 942 (1995)).

court could only enjoin it) if the court determined the issues raised in that second arbitration were necessarily determined in the earlier proceeding.[4]  Petitioners' argument here thus amounts to a claim that "the attorneys in [*Abu Dhabi*] just made the wrong arguments."  *See Gulf LNG Energy*, 242 A.3d at 594 (Vaughn, J., dissenting).  If only they had framed their claim in the language of collateral attack rather than the antecedent question of res judicata or collateral estoppel, a different result would have followed on the identical facts.  Like Justice Vaughn, "[i]t is hard for me to imagine that the distinction between *res judicata* and collateral attack would have led to different outcomes in those cases."  *Id.*

The contrary conclusion reached by the courts applying the collateral attack doctrine is based on a false equation of the claim that state or federal law permits the court to relieve a party of the effect of an adverse arbitration award outside the time limits of the FAA with the claim that a court should permit an arbitrator to determine whether an earlier award has claim- or issue-preclusive effect on assertions raised in a second arbitration.  They also occasionally, as in *Gulf LNG Energy,* are based on a review of the language of the arbitration clause that, particularly after *Henry Schein*, is remitted to the arbitrator.

The courts have uniformly held that a party cannot use state law where the only harm they allege is the arbitration award itself, because to do so would undermine Congress's intent manifested in the FAA that the exclusive remedy for vacating an arbitration award in court is by means of a claim under the FAA itself.  *See, e.g.*, *Mian v. Donaldson, Lufkin & Jenrette Sec.*

---

[4] *Abu Dhabi* also makes clear why permitting an arbitrator to determine whether the second arbitration constitutes an impermissible collateral attack on the first proceeding does no disrespect to the court order confirming the earlier arbitration award:  The proceeding to confirm an arbitration award "ordinarily is 'a summary proceeding that merely makes what is already a final arbitration award a judgment of the court,'" and does not address the "merits of any of [the] substantive claims."  *Id.* at 132-33 (quoting *D.H. Blair & CO., Inc. v. Gottdiener*, 462 F.3d 95, 110 (2d Cir. 2006)).

*Corp.*, 7 F.3d 1085, 1086 (2d Cir. 1993) ("The procedures established by 9 U.S.C. §§ 10 and 12 are normally the exclusive remedy to challenge the results of an arbitration proceeding."). Section 10 delegates to courts the task of reviewing challenges to arbitration awards and sets out the only factors that a court may consider in deciding whether to vacate an arbitral award.  A party may file a petition to vacate an arbitration award where (1) "the award was procured by corruption, fraud, or undue means"; (2) "there was evident partiality or corruption in the arbitrators, or either of them"; (3) "the arbitrators were guilty of misbehavior by which the rights of any party have been prejudiced"; or (4) "the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made."  9 U.S.C. § 10(a).  Under Section 12, "[n]otice of a motion to vacate, modify, or correct an award must be served upon the adverse party or his attorney within three months after the award is filed on delivered."  9 U.S.C. § 12.  This rule reflects the congressional intent that arbitration awards be accorded finality without delay and in a timely fashion.  *See Chauffeurs, Teamsters, Warehousemen & Helpers, Loc. Union No. 135 v. Jefferson Trucking Co., Inc.*, 628 F.2d 1023, 1027 (7th Cir. 1980) ("[T]he purpose of the short periods prescribed in the federal . . . arbitration statutes for moving courts to vacate an award is to accord the arbitration award finality in a timely fashion.").

It is uncontroversial that, because Section 10 is the exclusive method through which an arbitral award may be vacated by a court, a petitioner may not challenge an arbitral award through a state-law tort or contract claim.  To entertain a state-law claim where the only relief sought is from the effect of an arbitration award would create a backdoor for every aggrieved participant in an arbitration to avoid the stringent time frames and procedural and substantive requirements of the FAA by claiming not that the award should be vacated but that the conduct

of the arbitrator or its adversary constituted an independent tort and the award should not be

enforced.  The time limits and requirements of the FAA would be rendered illusory.

By contrast, a decision relegating to the arbitrator in the first instance the determination

whether a second arbitration constitutes an impermissible collateral attack on a first arbitration

does not serve to vacate an award or evade the FAA's time limits.  If Graham loses the second

arbitration, she will not have an opportunity to go to court to seek an order vacating the first

arbitration award.  Rather, such a decision, by leaving the matter to the arbitrators, honors both

the FAA and the parties' agreement.  The question whether rulings in a first arbitration are

entitled to estoppel or res judicata effect in a second arbitration or whether—the same question—

the second arbitration constitutes an impermissible attempt to relitigate issues raised in the first

arbitration is not always readily resolved.  The adjudicator must decide, among other things,

whether the losing party in the first arbitration had a full and fair opportunity to present the issue,

whether the claim could have been raised in the prior action, and whether the issue was actually

and necessarily decided in the prior action.  *See, e.g. Graham v. Select Portfolio Servicing, Inc.*,

156 F. Supp. 3d 491, 505-06 (S.D.N.Y. 2016) ("Under New York law, collateral estoppel bars

claims where '(1) the issue in question was actually and necessarily decided in a prior

proceeding, and (2) the party against whom the doctrine is asserted had a full and fair

opportunity to litigate the issue in the first proceeding.'") (quoting *Colon v. Coughlin*, 58 F.3d

865, 869 (2d Cir. 1995)).  The answers to these questions may involve complex issues of fact and

law.

This very case illustrates why the arbitrator should decide, in the first instance, whether

the second arbitration would require the factfinder to reverse factual determinations necessarily

made in the first arbitration and binding on Graham.  Here, the second arbitration involves

17

parties—CS and Warner—who were not named in the first arbitration.  The first arbitration named only CSFB and Palantir.  The two arbitrations also invoke different arbitration clauses and different contracts:  the first arbitration alleges claims arising out of a violation of the LLC Agreement, the second arbitration alleges claims arising out of the MSA.  The second arbitration raises the issue whether CS improperly used THS and if so, the relief that should follow from such use, issues that were expressly left unresolved in the first arbitration.  It also raises the question whether Warner violated her fiduciary duties to Signac, a question also not expressly adjudicated in JAMS I because Arbitrator Young ruled that Warner could not be added to the arbitrator.  JAMS II seeks to recover damages for unauthorized use of THS that occurred after JAMS I.  Dkt. No. 19 at 7.  The second arbitration seeks to enjoin CS's current and allegedly unauthorized use of THS and to recover monetary damages for the unauthorized use of THS after the date of the JAMS I hearings.  *Id.* at 19.  The parties each raise forceful arguments as to whether, nonetheless, the issues raised in JAMS II were necessarily decided in JAMS I and should be reconsidered.  Petitioners argue that JAMS II arises out of the same facts as JAMS I, and that Graham "asserts the same allegations and causes of action, and seeks the same relief that she was denied in JAMS I." Dkt. No. 26 at 5.  Graham responds that JAMS II names different defendants, has different claims, and seeks relief that the arbitrator could not have awarded in JAMS I because that proceeding was only against CSFB and Palantir, in spite of the arbitrator's finding that CS violated the MSA.  Dkt. No. 19 at 18-21.

The Court has no doubt it could form a judgment on those issues if it accepted the Petitioners' invitation and delved deeply into the record of the first arbitration.  But that is the point.  Both as a matter of efficiency and as a matter of respecting the parties' agreement, the arbitrator is better equipped than the Court to determine whether the second arbitration is

duplicative of the first and it should make that determination.  "[A] district court unfamiliar with the underlying circumstances, transactions, and claims, is not best interpreter of what was decided in the arbitration proceedings." *Abu Dhabi*, 776 F.3d at 133.   For the court to decide whether the second arbitration seeks to relitigate issues necessarily decided in the first arbitration and binding on the parties to the second arbitration, the court would have to make de novo determinations about both arbitrations, precisely the type of undertaking the FAA and the Supreme Court have instructed that the courts should avoid.

Furthermore, there is no harm to Petitioners through this resolution.  If, as Petitioners appear to argue, the second arbitration is wholly groundless, "[a]rbitrators can efficiently dispose of frivolous cases." *Henry Schein*, 139 S. Ct. at 531 (2019).  Moreover, "under certain circumstances, arbitrators may be able to respond to frivolous arguments for arbitration by imposing fee-shifting and cost-shifting sanctions, which in turn will help deter and remedy frivolous motions to compel arbitration." *Id.*  If, notwithstanding these protections, the arbitrator still ignores principles of res judicata and collateral estoppel in a manner that results in a decision in manifest disregard of the law, the losing party may pursue its arguments through a motion to vacate in federal court under Section 10 of the FAA.  *See Precision Castparts Corp. v. Schultz Holding GmbH & Co. KG*, 2020 WL 4003578, at *2 (S.D.N.Y. July 15, 2020) ("A court may vacate an arbitral award based on manifest disregard only upon a finding that '(1) the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether, and (2) the law ignored by the arbitrators was well defined, explicit, and clearly applicable to the case'.") (quoting *Zurich Am. Ins. Co. v. Team Tankers A.S.*, 811 F.3d 584, 589 (2d Cir. 2016)).  The court in that instance will have the benefit of the arbitrator's reasoning in the first instance.  If, however, it is even arguable that the second arbitration will not raise issues that were necessarily

decided and binding from the first arbitration, it would be wrong and inconsistent with the policies of the FAA to short-circuit the right to relief of the party seeking to compel arbitration and to stay arbitration even before an arbitrator has had the opportunity to hear her arguments.

Here, the second arbitration falls within the terms of the arbitration agreement. *See John Hancock*, 151 F.3d at 139 ("[T]he proper analytical inquiry mandated under the FAA is to focus on both the existence of a valid arbitration agreement and the nature of that agreement as it relates to the parties' current dispute."). In making this determination, the Court is mindful that "[a]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983).

Because this is so, Petitioners' argument fails and the Court will compel arbitration.

## CONCLUSION

For the foregoing reasons, the motion to compel arbitration is GRANTED and the motion to stay arbitration is DENIED.

SO ORDERED.

Dated: April 7, 2021
New York, New York

_____
LEWIS J. LIMAN
United States District Judge